**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **SHAWN AND ROBIN DAVIS, and** | ) | |
| **CRD HOLDINGS, LLC,** | ) | |
| | ) | **Case No. _____** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **JURY DEMAND** |
| **RANDOLPH LEE WHITE, GREG B.** | ) | |
| **MCDONALD, BIG SHAKE, LLC** | ) | |
| **and BLUE HORSE CAPITAL** | ) | |
| **PARTNERS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiffs Shawn and Robin Davis (the "Davises") and CRD Holdings, LLC, for their

causes of action against Defendants Randolph Lee White, Greg B. McDonald, Big Shake, LLC,

and Blue Horse Capital Partners, LLC, state as follows

## INTRODUCTION

1.      The Davises are a husband and wife who started a retail food business and then a

restaurant chain in Franklin, Tennessee.  Mr. Davis, known as "Chef Big Shake," obtained national

notoriety after his well-received appearance on the television show "Shark Tank" and subsequent

media exposure.  Mr. Davis appeared on numerous national and local television shows over several

years in order to grow his brand.  The retail food line sold the popular "Original Shrimp Burger,"

which at one time was sold in 2,500 grocery stores.  The business was successful and growing.

2.      In February 2015, Defendant Randolph Lee White approached the Davises about a

partnership that he promised would quickly bring the business to a national scale.  White made

representations about his success in the restaurant industry, the back-office and other resources he

could provide, his ability to quickly scale a chain of restaurants, the involvement and interest of former Kentucky Governor John Y. Brown, Jr. (the architect behind the growth of Kentucky Fried Chicken), White's commitment to expand the retail line, and the profits the company would make. The Davises were initially resistant. But after nine months of repeated representations from Defendant White and a personal visit from John Y. Brown to their Franklin restaurant, the Davises agreed to sell a 75% stake in their business to Defendants. In essence, the Davises sold a majority interest in their growing business for pennies on the dollar because of White's representations about his ability to make the Davises multi-millionaires through their 25% equity stake.

3.     Less than a year later, the Davises have learned that they were defrauded. Many of White's representations about his capabilities and intentions were false. Before closing, White introduced Mr. Davis to a team of back-office personnel in a building in Lexington that Mr. Davis was told would become the company's office. But after closing, those resources were nowhere to be found. Bills went unpaid. Vendors complained. The Lexington office is vacant and listed for lease. Before closing, White promised to open three new stores in Tennessee immediately, but after closing, it became clear that no openings had ever been planned. Before closing, White boasted of his relationship with Governor John Y. Brown, copying him on emails to the Davises and sending him to Franklin. After closing, the Governor was out of the picture. Before closing, White promised to expand the retail line, but after closing, it became clear that no activity was planned. White's representations were false when made and White knew they were false. Indeed, after closing, Defendant Greg McDonald told the Davises that, as a minority partner, they "had no power" and that "if you think you're getting another paycheck from me, you're crazy."

4.     In addition, Defendants omitted material information about White that was necessary to prevent his other statements from being misleading, including but not limited to (i)

White's recent federal and state tax liens, (ii) his prior bankruptcy, and (iii) a judgment against him for approximately $2.1 million. The Davises would have never gone into business with White if they knew then what they know now, nor would any other reasonable person.

5. These material misstatements and omissions are grounds to rescind the deal under the federal securities laws (Rule 10b-5 of the Securities and Exchange Act of 1934 and § 12(2) of the Securities Act of 1933) and Tennessee's blue-sky law. In addition, the deal should be rescinded because it involved the issuance of securities that were neither registered nor exempt. Defendants McDonald and Blue Horse Capital are liable jointly and severally as control persons of Defendant Big Shake, LLC. Rescission is also warranted because White's misstatements and omissions constitute fraudulent inducement under state law. Defendant McDonald has breached his fiduciary duty to Plaintiffs and committed conversion because money has been diverted from the company to Blue Horse Capital each month without explanation. Finally, Defendants have breached the operating agreement of Big Shake, LLC and state law by preventing the Davises, who are members of Big Shake, LLC, from accessing the company's books and records.

## PARTIES

6. Plaintiff Shawn Davis is an individual domiciled in Williamson County, Tennessee.

7. Plaintiff Robin Davis is an individual domiciled in Williamson County, Tennessee.

8. Plaintiff CRD Holdings, LLC is limited liability company registered and existing in the State of Tennessee. It was formed as a part of the transaction at issue. It is owned 100% by the Davises. Its principal place of business is Franklin, Tennessee.

9. Defendant R. Lee White is an individual domiciled in Lexington, Kentucky.

10. Defendant Greg McDonald is an individual domiciled in Lexington, Kentucky.

3

11.     Defendant Big Shake, LLC is limited liability company registered and existing in the State of Kentucky.  Its registered agent is Greg McDonald at 2220 Nicholasville Road, Suite 250, Lexington, Kentucky 40503.  Its principal place of business is Kentucky.

12.     Defendant Blue Horse Capital Partners, LLC is limited liability company registered and existing in the State of Kentucky.  Its registered agent is Greg McDonald at 2220 Nicholasville Road, Suite 250, Lexington, Kentucky 40503.  Its principal place of business is Kentucky.

## JURISDICTION AND VENUE

13.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint asserts one or more causes of action arising under federal law.

14.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between the Plaintiffs (all of whom reside in Tennessee) and the Defendants (all of whom reside in Kentucky), and the amount in controversy exceeds $75,000.

15.     Venue is proper in the Middle District of Tennessee under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District and the gravamen of the harm has occurred to Plaintiffs in this District.

## FACTUAL BACKGROUND

**A.     The Davises started a successful food business.**

16.     In 2009, Mr. Davis (known as Chef Big Shake) created the recipe for the "Original Shrimp Burger."  Mr. Davis began by selling Shrimp Burgers locally in Franklin but had ambitions to sell Shrimp Burgers in grocery stores throughout the country.

17.     In March 2011, Mr. Davis had his big break.  He appeared as a contestant on the television show Shark Tank, in which he pitched an investment in his Shrimp Burger business to

4

the Shark Tank investors. Mr. Davis's appearance on Shark Tank was an immediate media success and quickly brought national notoriety to Mr. Davis and his "Big Shake" brand.

18.     Over the next two years, Mr. Davis made more than twenty-five appearances on national and local television shows, including but not limited to Access Hollywood, the Jeff Probst Show, and QVC. In addition, Shark Tank's Season 3 provided an update segment about Chef Big Shake and his business. Mr. Davis worked hard to build the brand, and the business grew.

19.     In 2012, the Davises' business had gross revenues of $877,000 and net profits of $317,000. The Shrimp Burger was sold in approximately 2,500 grocery stores. As a result of Mr. Davis's culinary talent and the Davises' hard work, the business was already a success.

20.     By the end of 2013, the Davises took a pause from selling Shrimp Burgers in order to focus on another business aspiration: opening their first restaurant.

21.     In January 2014, the Davises opened their first restaurant, which was called Big Shake's Hot Chicken and Fish. The restaurant was located at 1409 West Main Street in Franklin, Tennessee (the "1409 West Main Street Store").

22.     In May 2015, the Davises opened a second Big Shake's Hot Chicken and Fish restaurant, which was located at 1203 Murfreesboro Road, Franklin, Tennessee (the "1203 Murfreesboro Road Store").

**B.     Lee White solicited the Davises with representations that his resources and personal connections could create a business that would make tens of millions of dollars.**

23.     In February 2015, the Davises were contacted by Defendant White. This contact was unsolicited by the Davises. White drove down to Franklin to visit one of the restaurants.

24.     During his initial visit, White told the Davises that he was part of the original executive team that launched and built Tempur-Pedic into a billion dollar company.

25.     White also told the Davises during his initial visit to their store that he had experienced great success as an investor and operator in the food industry, including that he brought the London-based restaurant *Yo! Sushi* to the United States and sold it for $150 million.

26.     After setting his hook by telling the Davises that he had sold businesses for hundreds of millions of dollars, White proposed a partnership with the Davises.

27.     Although the Davises were initially skeptical of the prospect of losing control of a growing business they had built over the past several years using Mr. Davis's national media profile, they entertained White's continued overtures over the next few months.

28.     In early May 2015, White invited Mr. Davis to Lexington, Kentucky to visit what he described as his "office" and to learn more about the resources he offered.

29.     On May 6, 2015, Mr. Davis visited White's office at 1056 Wellington Way, Suite 190, Lexington, Kentucky 40513.  White gave Mr. Davis a tour of the offices, which stretched throughout the first floor.  During the tour, Mr. Davis was introduced to people referred to as "partners" of the firm and shook hands with approximately ten different people, including the accountant who would be handling the books and the architect responsible for the design and layout of any new projects.  White also introduced Mr. Davis to other personnel, including human resources, public relations, and a realtor.  White represented to Mr. Davis that, if they entered into a partnership, he would roll out this infrastructure to support and grow the business.

30.     Over the next two months, White continued to reach out to the Davises about entering into some sort of partnership.

31.     On June 30, 2015, White emailed the Davises that he had a relationship with former Governor John Y. Brown of Kentucky, whom White suggested might be interested in launching a franchising component for the restaurant.  White's email stated:

6

I have a meeting with Gov John Y Brown of KY on Mon, July 6th at Noon. John Y is the former Gov of KY and perhaps one of the best known restaurateurs in the US. He was the brainchild behind the growth of KFC/Yum Brands and other well-known concepts. We are meeting to discuss Big Shake's and the possibilities of launching a franchising component. If all goes well, we will most likely come and visit Big Shake's towards the end of next week

32. On July 4, 2015, White emailed the Davises again about his relationship with Governor Brown and his interest in the business. White's email stated:

I have a luncheon this Mon with Gov John Y Brown of KY. He's the former Gov of KY and the man who built KFC/Yum Brands, along with Kenny Rogers Roasters and other fast casual concepts. He's looking for another vehicle to launch and is interest in learning about BS chicken/fish. . . . If all goes well, we will plan on coming down to see you so he can sample the food/get a sense of the concept. . . . This could prove to be a tremendous step forward on the restaurant side.

33. White's July 4, 2015 email to the Davises also represented that multiple grocery stores were ready to sell the Original Shrimp Burger. In particular, White stated he "ha[d] spoken with Kroger and others several times and they are ready to re-launch and test the product."

34. On July 10, 2015, White emailed Governor Brown and copied Mr. Davis. White told Governor Brown that "we would welcome you visiting one of our restaurants and to discuss next steps in the process of potentially launching Big Shakes via a franchise model."

35. On July 13, 2015, White texted Mr. Davis that he had heard from Kroger. Mr. Davis then asked "Good or bad???" White responded, "Good stuff…all around."

36. On July 16, 2015, White emailed Governor Brown, then forwarded it to Mr. Davis. White told Governor Brown that he was "following up on the text/voicemail I sent earlier. I spoke with Shawn (Chef Big Shake) and he will be at his new location in Franklin, TN this Sat." White's email to Governor Brown included the address for the Franklin restaurant.

37. On or about Saturday, July 18, 2015, Governor Brown drove to Franklin, Tennessee and met with the Davises at the restaurant. During the visit, Governor Brown tasted the food and

7

spoke with customers. He remained at the restaurant for approximately two hours. He told the Davises that he was looking for another restaurant to franchise to others.

38.    As the owners of a chicken restaurant, the Davises had great respect for Governor Brown's success with Kentucky Fried Chicken, were enormously impressed that White had led him to their restaurant, and were excited about his potential role in the business.

39.    White repeatedly referred to "the team" he would leverage if the Davises agreed to a partnership. White led the Davises to believe that John Y. Brown was part of the team.

40.    On July 23, 2015, White emailed Mr. Davis a pro forma for a partnership. He stated that "[t]he model depicts both an income and cash flow analysis for years 1-5."

41.    The pro forma forecasted that, over its first five years, the business would have revenues of $62,610,787 and net income of $29,712,784.

42.    White's July 23, 2015 email to the Davises contained no cautionary language about the risks of the proposed business and the likelihoods that these projections could be obtained.

43.    Nor did White disclose that he did not possess the capital required to meet the projected growth needs. As the Davises learned after the deal closed, White had no intention of opening a sufficient number of stores to support this projection.

44.    To the contrary, White repeatedly represented to the Davises that, because of his resources and connections, the partnership was a "can't miss" business that would have net profits of at least $30 million over its first five years.

45.    On July 30, 2015, White sent a text message to Mr. Davis that White had communicated with a contact at Amazon. White represented to Mr. Davis that Amazon wanted to explore launching the Shrimp Burger line on their website.

8

46.     On August 8, 2015, White again enticed the Davises with a representation about Governor Brown's interest in the business, emailing the Davises that "[a]s an update, Gov Brown thought your food quality was excellent. His only real comments came from restaurant design and executing a more fast casual menu."

47.     Based upon White's representations about Governor Brown's interest and his in-person visit to their store, White knowingly led the Davises to believe that Governor Brown's resources and/or business connections would be employed in a partnership.

48.     Up through closing, White never told the Davises that Governor Brown would not, in fact, be associated with their business or provide any support to their business.

49.     At the time of White's representations, White knew that Governor Brown would not be associated with the business. Yet White nonetheless led the Davises to believe that Governor would be associated with the business as part of his scheme to induce the Davises to sell a controlling interest in their business to him for far less than it was worth.

50.     On August 18, 2015, White emailed Mr. Davis another update. In the email, White "commit[ted] to 3 new Big Shake's restaurants (to immediately launch in the TN market)." He represented that "[w]e believe we can open at least 15 new units in the TN market alone." He committed to "the launch of the Big Shake's Original Shrimp Burger," which had been dormant. He represented that he would provide "Back Office – housed in Lex and to operate accounting, admin and HR" and "Marketing – housed in Lex and to operate social media/website."

51.     On August 21, 2015, White reiterated in an email to the Davises that, if an agreement was reached, the business would "immediately move forward with opening 3 new locations (we are responsible for all CapEx/associated costs)."

9

52.     White repeatedly told the Davises that he had a fund of $50 million that would be used to support the growth of the business as part of a partnership.  White's representations about the fund led the Davises to believe that there was sufficient capital for a rapid expansion.

53.     On September 18, 2015, White emailed the Davises that Plaintiff CRD Holdings, LLC had been formed and registered on the Davises' behalf.  He also reiterated that, after closing, Defendants would assume all accounting and HR operations.

54.     On October 3, 2015, White emailed the Davises more financial projections.  At the time, the parties were discussing the Davises taking a 25% ownership interest in the new business.

55.     White stated in the October 3, 2015 email that he "ran the numbers" of what the Davises' proposed 25% interest would be worth.  In the email, White stated that in six years there would be a total of 42 restaurants, which he described as "conservative / we could exceed."

56.     He then stated that based on his analysis, "which doesn't detail any baked in market/economic conditions (positive or negative), [the Davises'] position would potentially look as follows:  Equity ownership at 25% = $15,750,000.  Yearly/Ongoing Fees = $6,225,250."

57.     As with his other communications, White included no cautionary language about the risk or likelihood of these results.  Instead, he falsely represented to the Davises that these results were a midpoint ("positive or negative") and "conservative" ("we could exceed").

**C.     The Davises sold a 75% interest in their business for pennies on the dollar.**

58.     In reliance on White's representations, including repeated oral and written promises of back office and marketing services, the tour of the Lexington office, the financial projections,

the involvement of John Y. Brown, and White's commitment to open three new restaurants in Tennessee immediately after closing, the Davises agreed to sell 75% of their business.

59. The substance of the agreement was as follows. The Davises sold a 75% interest in nearly all of their business assets (including the 1203 Murfreesboro Road Store, the retail line, the "Big Shake" name, and their brand and recipes), in exchange for (i) a one-time cash payment of $55,000, (ii) the payoff of approximately $120,000 of business debt, and (iii) consulting agreements to pay each of the Davises $60,000/year to work in the 1203 Murfreesboro Road Store. The Davises retained the 1409 West Main Street Store, which Defendants did not seek to purchase.

60. Before the deal closed, the 1203 Murfreesboro Road Store had gross revenues of approximately $85,000/month, which equates to more than $1 million/year.

61. The Davises agreed to sell a 75% interest in their business for a relatively nominal sum because White led them to believe, through a series of false and misleading representations, that their 25% interest would be worth millions of dollars.

62. The deal was structured as sale of all of the assets of the Davises' restaurant business and retail line to Defendant Blue Horse Capital Partners, LLC, which the Davises later learned was controlled by Defendants Lee White and Greg McDonald. The asset sale occurred pursuant to an Asset Purchase Agreement, a copy of which is attached hereto as **Exhibit A**.

63. As part of the same transaction, Blue Horse Capital Partners, LLC assigned the purchased assets to Defendant Big Shake, LLC, which was created by McDonald and White. A copy of the Operating Agreement of Big Shake, LLC is attached hereto as **Exhibit B**. Big Shake, LLC is a manager-managed LLC, and its sole manager is Defendant Greg McDonald.

64. Finally, as part of the same transaction, Big Shake, LLC issued a 75% membership interest to Defendant Blue Horse Capital Partners, LLC and issued a 25% membership interest to Plaintiff CRD Holdings, LLC (an entity owned 100% by the Davises).

65. All of the transaction documents, which were drafted by counsel for Defendants, are dated November 16, 2015 and were signed on or about on that date. This transaction is referred to herein as the "November 2015 Transaction."

**D. After closing it became clear that many of White's representations about his resources and intentions for the business were false and misleading.**

66. After the Davises agreed to sell a 75% interest in their business to Defendants, it became clear that many of White's representations were false and misleading.

67. The Davises continued to operate the 1203 Murfreesboro Road Store pursuant to their consulting agreements. Although White represented before closing that he would provide substantial back office and marketing support for the business, no such support existed.

68. For example, the Davises never heard from the accountant, the architect, or many of the other professionals that White told Mr. Davis would be a part of the team. Instead, the Davises learned through one of their vendors that White had hired his sister to handle the books.

69. The building in Lexington, Kentucky that White represented would be the company's office is vacant and listed for lease. Upon information and belief, the building was never planned to be the office for the new business, as White represented. Instead, White used the office to create an appearance of vast in-house administrative support, when none existed.

70. Due to the lack of back office support from Defendants, the vendors to the Franklin stores with whom the Davises had worked for years told the Davises that their bills were going unpaid. The Davises had to plead with their vendors not to cut off deliveries.

12

71.     In addition, although the Davises operated the 1203 Murfreesboro Road Store under Big Shake, LLC for nine months, Defendants never gave them payment cards for the company. As a result, the Davises were forced to pay out of pocket for basic operational and other expenses.

72.     Further, despite the Davises' repeated requests, Defendants failed to perform basic maintenance on the 1203 Murfreesboro Road Store.  For example, the Davises repeatedly notified Defendants of mildew in the ceiling tiles and rotting drywall, but Defendants took no action.  Nor would Defendants authorize the Davises to perform this maintenance themselves.

73.     For the reasons described above and others, Defendants provided none of the back office and other administrative support that White repeatedly promised before closing.

74.     Despite White's repeated promise to the Davises that Defendants would open three new stores in Tennessee "immediately" after closing, it became clear after closing that no such plans existed.  Defendants had taken none of the action necessary to open three new stores.

75.     Instead, Defendants opened only a single store in Lexington, Kentucky (the "Lexington Store").  To the Davises' knowledge, no other store openings are planned or pending.

76.     On July 29, 2016, Defendant McDonald told the Davises on a phone call that as a minority partner in Big Shake, LLC they had "no power" and that, despite their legally binding consulting agreements and their right to share in any distributions as members of Big Shake, LLC, "if you think you're getting another paycheck from me, you're crazy."

77.     Despite White's promise to re-launch the Shrimp Burger retail line after closing and his representations that Kroger and other grocery stores were ready to launch the product, it became clear that no such plans existed.  Although the Davises are members of Big Shake, LLC with rights to receive information about the company, they have received no information about re-launching the shrimp burger, and nearly a year has passed since closing.

13

78.     It became clear after closing that former Governor John Y. Brown would not be associated with the business. Since closing, Governor Brown has had no association whatsoever. White intentionally misled the Davises to believe the business would benefit from Governor Brown's involvement so he could persuade them to sell a 75% interest in their business.

79.     Defendants' failure to pay vendors, failure to maintain the 1203 Murfreesboro Road Store, failure to give the Davises payment cards, failure to open new restaurants as promised, and failure to re-launch the Shrimp Burger as promised have harmed the "Big Shake" brand, the Franklin stores, and the Davises' professional and personal reputations.

**E.     Lee White failed to disclose material information about his past.**

80.     In addition to his false and misleading representations, White intentionally omitted material information about his own personal history while soliciting the Davises.

81.     White boasted to the Davises that he was an early executive of Tempur-Pedic, which he said was sold for billions of dollars. He also told them that he brought the London-based restaurant *Yo! Sushi* to the United States and sold it for $150 million. White portrayed himself as someone with substantial restaurant-industry experience and great wealth.

82.     Yet White failed to disclose, for example, two tax liens recorded against him *only months before closing*. The Internal Revenue Service recorded a tax lien against White on August 4, 2015 in the amount of $51,255. And the State of Kentucky recorded a tax lien against him in the amount of $6,518. These liens strongly belie White's representations.

83.     White also failed to disclose other parts of his checkered financial history, including (i) a $2,154,886 judgment obtained against him in August 2008 in North Carolina courts by Sealy Mattress Company and (ii) a personal bankruptcy he filed in October 1994. According to the North Carolina courts, the $2,154,886 judgment against White remains active.

14

**F.      The securities issued to the Davises were neither registered nor exempt.**

84.      As discussed above, Big Shake, LLC issued a 25% membership interest to Plaintiff CRD Holdings, LLC, which is 100% owned by the Davises.

85.      The membership interest issued to Plaintiff is a security.  The Davises have no control over Big Shake, LLC.  Pursuant to its Operating Agreement, Big Shake, LLC is a manager-managed LLC, and its sole manager is Defendant Greg McDonald.[1]  Although the Davises own a 25% membership interest, the members act through a majority.[2]  Blue Horse Capital Partners, LLC holds a 75% interest and, thus, controls the company on behalf of the members.  The Operating Agreement expressly states that each membership interest shall be treated as a security.[3]

86.      The securities issued by Big Shake, LLC must comply with federal and state securities laws, including but not limited to being registered or exempt.

87.      The membership interest issued by Big Shake, LLC to the Davises was neither registered nor exempt under the federal Securities Act of 1933, 15 U.S.C. § 77a *et seq.*

88.      Big Shake, LLC did not file a registration statement for this offering with the U.S. Securities and Exchange Commission (the "SEC") or any applicable state securities agency.

89.      Nor does any exemption to registration apply.  In particular, the offering does not comply with any of the Regulation D exemptions under the Securities Act of 1933.  The Davises are not accredited investors as defined by law.  Indeed, the Davises' annual household income and wealth fall far below the thresholds necessary to qualify as accredited investors.  Because the Davises are not accredited investors, CRD Holdings, LLC, which they own, is not an accredited investor.  In addition, the issuer Big Shake, LLC did not file a Form D with the SEC.

---

[1]      Operating Agreement § 14.1.
[2]      Operating Agreement § 14.3.
[3]      Operating Agreement § 5.7.

90.     The offering does not qualify as a private offering under 15 U.S.C. § 77d(a)(2) (the "Section 4(2) exemption").  The Davises are unsophisticated investors who are unable to fend for themselves.  Neither of the Davises have college degrees.  Although Mr. Davis is skilled as a chef and the Davises worked hard for years to build their brand, they had never before invested capital in a business in which they had no control.  The Davises are exactly the sort of people who require the protections afforded by registration, including full and fair disclosures.

91.     On July 16, 2015, White emailed Mr. Davis that he would be leveraging the business through an offering in the amount of $3 million.

**G.      The Davises have been denied access to the Company's books and records.**

92.     The Davises were not only defrauded when they sold their company, but they have been unlawfully shut out from reviewing its financial records after the sale.

93.     As members, the Davises have repeatedly requested basic financial information about Big Shake, LLC, but Defendants have systematically denied access to this information.

94.     The Davises' requests include, but are not limited to, (i) a request on June 10, 2016 for the company's profit and loss statement and (ii) a request on July 19, 2016 for the company's detailed profit and loss statement and a vendor export from the company's accounting software.

95.     The Davises have asked Defendants to allow them to review the company's bank statements and employment agreements and to give the Davises access to the company's point-of-sale system.  Despite the Davises' rights, Defendants have denied their requests.

96.     As members of Big Shake, LLC, the Davises are entitled to review the company's books and records.  The Operating Agreement provides that a member may examine or copy the company's books and records "upon reasonable written request."[4]  Further, Kentucky law provides

---

[4]      Operating Agreement § 11.1.

that managers "shall render, to the extent the circumstances render it just and reasonable, true and full information of all matters affecting the members to any member."[5]

97. Although Defendants have denied the Davises access to the company's books and records, the Davises were able to obtain copies of the company's bank statements and checks directly from the bank for certain months from November 2015 through August 2016.

98. The statements and checks obtained by the Davises show that, for each month from January 2016 through July 2016, the company paid $6,000 to Defendant Blue Horse Capital Partners, LLC by check. The Davises cannot conceive of what these monthly payments could be, other than an unlawful self-dealing transaction or an unlawful distribution. Although the Davises are also members of the company through CRD Holdings, they have received no distributions.

99. Without access to the company's books and records, the Davises cannot confirm whether these funds are being misappropriated by Defendants or used for a proper purpose

100. In addition to the monthly payments of $6,000 to Defendant Blue Horse Capital Partners, LLC as described above, the bank statements and checks show other suspicious and apparent self-dealing transactions by the company.

**H.     The Davises repurchased a portion of their business from Defendants at a greater price than they sold the entire business, yet Defendants continued to exploit them.**

101. Because Defendants were failing to perform the basic tasks necessary to run the business, much less expand the business nationally as promised, and the vendors to 1203 Murfreesboro Road Store were going unpaid, the "Big Shake" brand was being harmed.

---

[5]     Ky. Rev. Stat. Ann. § 275.185(3).

102.     In particular, Defendants' fraud and failure to properly run the business has harmed the Davises' reputation, reduced their goodwill with customers, prevented them from pursuing other profitable business opportunities, and damaged their relationships with vendors.

103.     The Davises decided that, in order to stem the harm to their brand and business, they would attempt to repurchase the 1203 Murfreesboro Road Store from Big Shake, LLC.

104.     As a result, in August 2016, the Davises entered into an agreement with Defendants to repurchase the 1203 Murfreesboro Road Store for a total amount of approximately $250,000 ($225,000 cash plus promise to pay approximately $23,000) (the "August 2016 Transaction").

105.     It was less than a year earlier that Defendants had purchased all of the Big Shake business from the Davises, including the 1203 Murfreesboro Road Store, the retail line, and all intellectual property for only $175,000 and a minority ownership interest in the new LLC.

106.     In essence, Defendants sold back to the Davises only a small portion of what they had purchased less than a year earlier, and still turned a substantial profit at the Davises' expense. Yet Defendants still claimed to own the "Big Shake" brand, the Davises' recipes, and all intellectual property created by the Davises and demanded an additional $3 million to return it.

107.     In effect, Defendants are holding the Davises' brand for an additional ransom while, at the same time, they are running the business into the ground. Customer reviews reveal that the Lexington Store fails basic operational tests, such as a functioning ice machine. The Davises worked hard for years to build their brand and their business and are harmed by this conduct.

108.     The Davises would have never sold a 75% interest in their business to Defendants in the absence of White's false and misleading representations and material omissions. As a result of this fraud, the November 2015 Transaction was void and must be rescinded.

18

109.     After defrauding the Davises, shutting them out of their own business, harming their brand, and selling them back a portion of their business for a profit, Defendants are now trying to extract whatever remaining value they can from the Davises.  This conduct cannot be successful, however, because November 2015 Transaction was void and must be rescinded.

## CAUSES OF ACTION

### Count 1:  Securities Fraud (Tennessee Blue Sky Law)

110.     Plaintiffs incorporate by reference the allegations set forth above.

111.     Under the antifraud provision in Tennessee's blue sky law, it is unlawful for any person, in connection with the sale of any security, to "[m]ake any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."  Tenn. Code Ann. 48-1-121(a)(2).

112.     Defendant Big Shake, LLC issued a security to Plaintiffs.

113.     Defendant R. Lee White made false and misleading statements to the Davises in connection with the sale of the security.  In particular, as discussed in detail above and incorporated by reference, White represented he would provide various back office and marketing services, he would open three restaurants in Tennessee immediately upon closing, he would grow the Shrimp Burger retail line, he would leverage the support of former Kentucky Governor John Y. Brown, and the business would have net profits of $30 million over its first five years.

114.     White also failed to disclose information to the Davises, such as his recent federal and state tax liens, the $2.1 million judgment against him, and his personal bankruptcy.

115.     White's misrepresentations and omissions were material.  There is a substantial likelihood that that a reasonable purchaser would have considered such information important. The Davises, who are not sophisticated investors, relied heavily upon White.  White knew, at the time of his misrepresentations and omissions, that they were false and misleading.

19

116. Plaintiffs were harmed by White's misrepresentations and omissions. If the Davises had known the truth, they would have never done business with White.

117. Defendants Greg McDonald and Blue Horse Capital Partners, LLC are jointly and severally liable as control persons of the issuer Big Shake, LLC. Tenn. Code Ann. § 48-1-122(g).

118. McDonald is a control person because of his direct control of Big Shake, LLC as its manager. Blue Horse Capital Partners, LLC is a control person because of its indirect control as the majority member of Big Shake, LLC, in which members act through a majority vote.

119. Under Tennessee law, the November 2015 Transaction must be rescinded. The parties should be put into their respective places as if the November 2015 Transaction had never occurred, such that:

(i) the Asset Purchase Agreement, the Operating Agreement, the Davises' consulting agreements, and all related deal documents for the November 2015 Transaction are declared null and void;

(ii) the asset purchase agreement and all related deal documents for the August 2016 Transaction, which was derivative to the November 2015 Transaction, are declared null and void;

(iii) the Davises are declared full owners of the "Big Shake" brand and all associated intellectual property,

(iv) the Davises are refunded the difference between the consideration they received as part of the November 2015 Transaction (approximately $175,000, including business debts paid) and the consideration the Davises paid to Defendants as part of the August 2016 Transaction ($225,000), with interest (for a net payment of approximately $50,000, plus interest, from Defendants to the Davises);

20

(v)    the Davises retain ownership of the 1203 Murfreesboro Road Store;

(vi)    Defendants retain ownership of the Lexington Store, which was the only store opened using Defendants' capital; and

(vii)    Defendants disgorge to the Davises the amount by which the operating profits for 1203 Murfreesboro Road Store exceeded the amounts paid to the Davises under their consulting agreements.

120.    In addition, the Court should award damages to the Davises in an amount to be determined at trial for the harm to their reputation and business arising out this fraud.

**Count 2:  Securities Fraud (Rule 10b-5 of the Securities and Exchange Act of 1934)**

121.    Plaintiffs incorporate by reference the allegations set forth above.

122.    Under the Securities and Exchange Act of 1934 and its regulations, it is unlawful for any person in connection with the sale of a security to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 CFR § 240.10b–5.

123.    Big Shake, LLC issued a security to Plaintiffs.

124.    As discussed above, White made material misrepresentations and omissions to the Davises in the connection with the sale of a security.  In particular, as discussed above and incorporated by reference, White represented he would provide various back office and marketing services, he would open three restaurants in Tennessee immediately upon closing, he would grow the shrimp burger retail line, he would leverage the support of former Kentucky Governor John Y. Brown, and the business would have net profits of $30 million over its first five years.

125.    White knew that his misrepresentations and omissions to the Davises were false and misleading.  White knew, for example, of his recent tax liens, that the Davises would be

impressed by his invocation of former Governor John Y. Brown, and the fact that he did not intend to open three restaurants in Tennessee immediately after closing.

126.    The Davises relied on White's material misrepresentations and omissions, without which the Davises would never have entered into the transaction.

127.    White's material misrepresentations and omissions harmed the Davises.

128.    Defendants Greg McDonald and Blue Horse Capital Partners, LLC are jointly and severally liable as control persons of the issuer Big Shake, LLC under federal law.

129.    Under federal law, the November 2015 Transaction must be rescinded as described in Count 1, *supra*, which is incorporated by reference.

130.    In addition, the Court should award damages to the Davises in an amount to be determined at trial for the harm to their reputation and business arising out this fraud.

**Count 3:  Failure to Register Securities (Federal Securities Act of 1933)**

131.    Plaintiffs incorporate by reference the allegations set forth above.

132.    Under the federal Securities Act of 1933, it is unlawful to sell unregistered securities unless an exemption applies.  15 U.S.C. § 77e(a).

133.    Any person who sells a security in violation of § 77e shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security.  15 U.S.C. § 77l.

134.    The membership interests in Big Shake, LLC were not registered.

135.    No exemption applies.  The offering does not comply with Regulation D.  The Davises are not accredited investors.  Big Shake, LLC did not file a Form D.  The offering does

22

not qualify as a private offering under Section 4(2). The Davises are unsophisticated investors who are unable to fend for themselves and need the protections of full and fair disclosures.

136. Defendants Greg McDonald and Blue Horse Capital Partners, LLC are jointly and severally liable as control persons of the issuer Big Shake, LLC under federal law.

137. Under federal law, the November 2015 Transaction must be rescinded as described in Count 1, *supra*, which is incorporated by reference.

138. In addition, the Court should award damages to the Davises in an amount to be determined at trial for the harm to their reputation and business arising out of the transaction.

**Count 4: Securities Fraud (Section 12(2) of the Securities Act of 1933)**

139. Plaintiffs incorporate by reference the allegations set forth above.

140. Under the Securities Act of 1933, it is unlawful for any person who sells a security by means of any prospectus or oral communication to make an untrue statement of material fact or to omit any material fact that is necessary to disclose under the circumstances in order to make the person's other statements not misleading. 15 U.S.C. § 77l(a)(2).

141. Defendants White and Big Shake, LLC sold a security to Plaintiffs by means of numerous oral communications.

142. As discussed above, White made material misrepresentations and omissions to the Davises, both orally and in writing, in the connection with the sale of the security. In particular, as discussed above and incorporated by reference, White represented he would provide various back office and marketing services, he would open three restaurants in Tennessee immediately upon closing, he would grow the shrimp burger retail line, he would leverage the support of former Kentucky Governor John Y. Brown, and the business would have net profits of $30 million over its first five years. Many of the statements made in writing were also made orally.

143. White's material misrepresentations and omissions harmed the Davises.

23

144.     Defendants Greg McDonald and Blue Horse Capital Partners, LLC are jointly and severally liable as control persons of the issuer Big Shake, LLC under federal law.

145.     Under federal law, the November 2015 Transaction must be rescinded as described in Count 1, *supra*, which is incorporated by reference.

146.     In addition, the Court should award damages to the Davises in an amount to be determined at trial for the harm to their reputation and business arising out this fraud.

### Count 5:  Fraudulent Inducement (Tennessee law)

147.     Plaintiffs incorporate by reference the allegations set forth above.

148.     White made false statements and omissions concerning facts material to the transaction.  In particular, as discussed in detail above and incorporated by reference, White represented he would provide various back office and marketing services, he would open three restaurants in Tennessee immediately upon closing, he would grow the Shrimp Burger retail line, he would leverage the support of former Kentucky Governor John Y. Brown, and the business would have net profits of $30 million over its first five years.

149.     White knew of the falsity or acted in utter disregard for the truth.

150.     White acted with intent to induce reliance on the statements.

151.     The Davises in fact relied on White's statements under circumstances manifesting a reasonable right to rely on those statements.  In particular, it was reasonable for the Davises to rely on White's repeated statements about the services he would provide, his promises to open many stores and create a national brand, and his projections of the company's net profits.

152.     The Davises were harmed by their reliance on White's representations.

153.     Under Tennessee law, the November 2015 Transaction must be rescinded as described in Count 1, *supra*, which is incorporated by reference.

154.     In addition, the Court should award damages to the Davises in an amount to be determined at trial for the harm to their reputation and business arising out this fraud.

## Count 6:  Breach of Fiduciary Duty

155.     Plaintiffs incorporate by reference the allegations set forth above.

156.     As the manager of Big Shake, LLC, Defendant McDonald owes a fiduciary duty to the company and its members, including Plaintiffs.  This fiduciary duty includes, but is not limited to, not engaging in self-dealing transactions and ensuring that company funds are not misappropriated.

157.     Upon information and belief, under Defendant McDonald's direction and/or supervision, funds have been unlawfully diverted out of Big Shake, LLC's operating account and to Defendant Blue Horse Capital Partners, LLC.

158.     In particular, the company paid Blue Horse Capital $6,000/month for, at the very least, each month from January 2016 through July 2016 for no apparent reason.  These payments constitute either an unlawful self-dealing transaction or an unlawful distribution.

159.     Plaintiffs have received no distributions from Big Shake, LLC.  And on July 29, 2016, Defendant McDonald told the Davises on a phone call that as a minority partner they "had no power" and that "if you think you're getting another paycheck from me, you're crazy."

160.     Defendant McDonald's conduct constitutes wanton or reckless misconduct.

161.     Plaintiffs have been harmed by this breach of fiduciary duty in an amount to be determined at trial.

162.     Plaintiffs request that an accounting be ordered of Big Shake, LLC's operating account and any other financial accounts.

163.     Plaintiffs also request that a receiver be appointed to manage Big Shake, LLC for the duration of this litigation.

## Count 7:  Conversion

164.     Plaintiffs incorporate by reference the allegations set forth above.

165.     Upon information and belief, Defendant McDonald has unlawfully converted funds belonging to Big Shake, LLC by making monthly unauthorized payments of $6,000/month to Defendant Blue Horse Capital Partners, LLC.

166.     The converted funds belonged to Big Shake, LLC, which had possession of them.

167.     By making unauthorized payments to Defendant Blue Horse Capital, Defendant McDonald intentionally exercised dominion over the property and denied it from the company.

168.     Defendant McDonald's act was the legal cause of the loss of the property, and Plaintiffs have been damaged by the loss of the property in an amount to be determined at trial.

169.     Plaintiffs request that an accounting be ordered of Big Shake, LLC's operating account and any other financial accounts.

170.     Plaintiffs also request that a receiver be appointed to manage Big Shake, LLC for the duration of this litigation.

## Count 8:  Denial of Access to Books and Records

171.     Plaintiffs incorporate by reference the allegations set forth above.

172.     Plaintiffs have requested basic financial information about Big Shake, LLC for a proper purpose, but they have repeatedly been denied access to this information.

173.     As members of Big Shake, LLC, Plaintiffs are entitled to review the company's books and records.  The Operating Agreement provides that a member may examine or copy the

company's books and records "upon reasonable written request."[6]  Kentucky law provides that managers "shall render, to the extent the circumstances render it just and reasonable, true and full information of all matters affecting the members to any member."[7]

174.    Plaintiffs are entitled to access the company's book and records, and true and full information affecting them as members.

175.    Plaintiffs have been damaged by being denied access to this information in an amount to be determined at trial.

Plaintiffs demand a jury on all issues so triable.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request and pray as follows:

A.    That proper process issue and be served on Defendants and that they be required to appear and answer the Complaint within the time prescribed by law;

B.    That Plaintiffs receive a jury trial on all the issues so triable;

C.    That the Court find that White made material misrepresentations and omissions in connection with the sale of a security, such that the November 2015 Transaction must be rescinded as described in detail in Count 1, *supra*, pursuant to state and federal law;

D.    That the Court find that the membership interests issued by Big Shake, LLC were not registered or exempt, such that the issuance must be rescinded pursuant to federal law;

E.    That Plaintiffs be awarded damages in an amount to be determined at trial, including punitive damages for Defendants' wanton and willful misconduct.

---

[6]    Operating Agreement § 11.1.
[7]    Ky. Rev. Stat. Ann. § 275.185(3).

F.     That the Court find that Defendants McDonald and Blue Horse Capital Partners, LLC are jointly and severally liable for the rescission and all damages;

G.     That the Court find that Defendants denied Plaintiffs access to Big Shake, LLC's books and records and order that Defendants provide true and full information to Plaintiffs;

H.     That the Court order an accounting of Big Shake, LLC's operating account and any other financial accounts;

I.     That a receiver be appointed to manage Big Shake, LLC;

J.     That the Court find that Defendants are jointly and severally liable for Plaintiffs' reasonable attorneys' fees and expenses pursuant to Tenn. Code Ann. § 48-1-122(f) and other law;

K.     That the costs of this action be taxed to Defendants; and

L.     That the Court award such other and further relief that the Court deems appropriate.


Dated:        October 31, 2016                    Respectfully submitted,


                                                  /s/  Ryan T. Holt                              _
                                                  John L. Farringer IV (No. 22783)
                                                  Ryan T. Holt (No. 30191)
                                                  SHERRARD ROE VOIGT & HARBISON, PLC
                                                  150 3rd Avenue South, Suite 1100
                                                  Nashville, Tennessee 37201
                                                  (615) 742-4200
                                                  (615) 742-4539 (facsimile)
                                                  jfarringer@srvhlaw.com
                                                  rholt@srvhlaw.com

                                                  *Attorneys for Plaintiffs Shawn and Robin Davis and CRD Holdings, LLC*

Case 3:16-cv-02817   Document 1   Filed 10/31/16   Page 28 of 28 PageID #: 28